No. _____

# In the United States Court of Appeals
## FOR THE THIRD CIRCUIT

LOGIC TECHNOLOGY DEVELOPMENT LLC
PETITIONER,

*v.*

U.S. FOOD AND DRUG ADMINISTRATION,
RESPONDENT.

On Petition For Review Of An Order
Of The U.S. Food And Drug Administration

## PETITIONER LOGIC TECHNOLOGY DEVELOPMENT LLC'S EMERGENCY MOTION FOR A PARTIAL ADMINISTRATIVE STAY

BRYAN M. HAYNES
TROUTMAN PEPPER
HAMILTON SANDERS LLP
1001 Haxall Point
15th Floor
Richmond, VA 23219
(804) 697-1420
bryan.haynes@troutman.com

KAITLIN L. O'DONNELL
TROUTMAN PEPPER
HAMILTON SANDER LLP
3000 Two Logan Square,
Eighteenth and Arch Streets
Philadelphia, PA 19103
(215) 981-4356
kaitlin.o'donnell@troutman.com

MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
SEAN T.H. DUTTON
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

*Attorneys for Petitioner*

## EMERGENCY MOTION FOR
## A PARTIAL ADMINISTRATIVE STAY

Yesterday, October 26, U.S. Food And Drug Administration ("FDA") issued without prior notice an unlawful and deeply harmful Marketing Denial Order ("MDO") to Petitioner Logic Technology Development LLC ("Logic"), three years after Logic's submission to FDA. The MDO requires Logic to **immediately stop selling two tobacco products that retailers have lawfully sold at stores all over the country for seven years**. While Logic intends to seek a full stay of the MDO pending appeal and will submit fulsome briefing in support of that stay on any schedule that this Court orders, the time necessary for briefing and decision on such a stay would impose grave, irreparable harm upon Logic, which could not be unwound.

Accordingly, **Logic respectfully requests that this Court issue an emergency administrative stay under Federal Rule of Appellate Procedure 18(a)(2) of the MDO as to the two Logic products that are currently on the market—Logic Pro Menthol e-Liquid Package, and Logic Power Menthol e-Liquid Package—today, October 27**.[1] That is what the

---

[1] The MDO also prohibited Logic from marketing a third product, Logic Vapeleaf Menthol Green Cartridge/Capsule Package. However, this product is not currently on the market and therefore it is not relevant to the partial administrative stay period that Logic seeks here.

D.C. Circuit did in *Juul Labs, Inc. v. FDA*, No. 22-1123 (D.C. Cir. June 23, 2022)—issuing an administrative stay on the same day that Juul filed its request—and Logic submits that the equities and merits of the present case are far more compelling than in *Juul*.[2]

1. On August 19, 2019, Logic submitted Premarket Tobacco Product Applications ("PMTAs") to FDA, seeking approval to market fifteen different products, including the two products relevant to this motion: Logic Pro Menthol e-Liquid Package and Logic Power Menthol e-Liquid Package. Logic was issued marketing granted orders on March 24, 2022, for its devices and for its tobacco flavored liquids. With respect to the menthol version of the liquids, Logic supported its applications with thousands of pages of documents, including randomized controlled trials and studies conducted over time, demonstrating that Logic's products are a less harmful alternative to cigarettes for adult smokers, while youth overwhelmingly do not use or intend to use Logic products. Exhibit 2,

---

[2] For example, in the *Juul* case, the FDA identified a health concern with Juul's product (potential leakage of liquid), that is plainly absent here. Rather, the FDA is making a policy argument that while Logic's tobacco flavored product is appropriate for the protection of public health (and received marketing granted orders from the FDA in March of this year), its menthol version of the same products should be banned for policy reasons—likely the same policy reasons underlying a proposed rule banning menthol in cigarettes.

Declaration of Corrado Mautone ("Ex.2") at 5–6.[3]  Logic showed, for example, that the majority of Logic's prior online sales were to customers 41 to 60 years old, while customers 21 to 30 years old made up just 7% of online sales.  Ex.2 at 5.  Further, Logic demonstrated that its products have not been shown to be popular among youth in any major studies on youth vaping.  Ex.2 at 5.

Because Logic submitted its PMTAs to FDA well before the deadline of September 9, 2020, FDA permitted Logic to continue to sell its products at issue here while FDA reviewed its PMTAs.  *See* FDA, *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market with Premarket Authorization (Revised)* at 27 (April 2020).[4]  Accordingly, Logic invested substantial sums in responsible marketing of its products to adult

---

[3] Given the press of time and the immediate, irreparable harms Logic faces from FDA's unlawful MDO, Logic relies in this briefing on the sworn declaration of its President Corrado Mautone to bring the necessary facts before this Court.  In its upcoming filings in this case, Logic intends to present the Court with all of the voluminous submissions and evidence it presented to FDA in support of its applications.

[4] Available at https://www.fda.gov/media/133880/download#%5B %7B%22num%22%3A67%2C%22gen%22%3A0%7D%2C%7B%22name% 22%3A%22FitR%22%7D%2C-188%2C-3%2C800%2C795%5D (all websites last visited Oct. 27, 2022).

smokers, in materials and equipment needed to manufacture the products at its factory in China, and in distribution networks needed to safely import the products into the United States. Ex.2 at 2–3.

Logic Pro Menthol e-Liquid Packages and Logic Power Menthol e-Liquid Packages are widely distributed in the United States. Logic products are distributed in almost 8,000 retail stores across the country. Ex.2 at 2. Logic's menthol sales account for over $6 million in annual revenue and many jobs in the US and abroad are reliant on these sales. Ex.2 at 2. Over $1.4 million worth of materials and packaging are currently in Logic's inventory dedicated to the manufacture of Logic Pro Menthol and Logic Power Menthol e-Liquid Packages. Ex.2 at 2.

On October 26, 2022, over three years after Logic submitted its applications and without any prior notice to Logic, FDA issued the MDO at issue here. Suddenly and unexpectedly, Logic may no longer "introduce or deliver [its products] for introduction [ ] into interstate commerce in the United States," otherwise Logic will be in violation of the Federal Food, Drug & Cosmetic Act and face enforcement action by FDA. Exhibit 1, Letter from FDA to Logic Technology Development LLC ("Ex.1") at 1. FDA's conclusion that marketing Logic's menthol products

would not be appropriate for the protection of the public health is at odds with the agency's own admittance that menthol-flavored ENDS are an important option for menthol cigarette smokers who want to transition away from smoking. FDA, *Menthol and Other Flavors in Tobacco Products* (Apr. 29, 2021).[5] And while FDA now claims that all flavored products, including menthol, pose a risk to youth, its Order cites no evidence that youth use Logic's menthol products. *See* Ex.1 at 2. On the contrary, past and recent studies show that Logic's products are not used by youth. Ex.2 at 5.

2. In deciding whether to grant a stay of an agency action pending appeal—including an administrative stay under FRAP 18(a)(2)—this Court considers four factors: (1) "whether the stay applicant has made a strong showing that it is likely to succeed on the merits" (2) "whether the applicant will be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (alteration omitted) (quoting

---

[5] Available at https://www.fda.gov/tobacco-products/products-ingredients-components/menthol-and-other-flavors-tobacco-products.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).[6]

a. Considering first the three equitable stay considerations—given that Logic here seeks only a partial administrative stay, until this Court can decide whether to stay the MDO pending appeal—all of those considerations strongly favor issuance of an administrative stay.

Logic will unquestionably suffer grave, irreparable harm unless this Court issues an administrative stay as to the two products that are currently on the market, because Logic will never be able to recover the substantial sums of money damages from FDA for the lost sales, costs of diverting production, and loss of goodwill among trade partners and customers from having to abruptly remove these two products from the market.  *See Pennsylvania v. President of the U.S.*, 930 F.3d 543, 574 (3d Cir. 2019), *rev'd on other grounds sub nom. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020);

---

[6] Pursuant to Rule 18(a)(2)(A), Logic moved before FDA for a stay of the Agency's MDO, Ex.2 at 1, but FDA "failed to afford the relief requested" in a timely manner, given the impending irreparable harms facing Logic from the MDO, Fed. R. App. P. 18(a)(2)(A)(ii).

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("[N]umerous courts have held that the inability to recover monetary damages . . . renders the harm suffered irreparable."); *see* 5 U.S.C. § 702 (precluding recovery of "money damages" in APA suits). Because the products are currently in circulation, Logic will incur significant logistical costs diverting resources to stop the movement of the products, segregate them from lawful products, and communicate distribution changes to its distribution network. Ex.2 at 2–3.

Absent an immediate stay, the MDO will force Logic to lose substantial sums in sales, which it can never get back. FDA's prohibition affects Logic's sale and marketing of products that have been on store shelves since at least 2014. Ex.2 at 2. Removing these products from store shelves would require Logic to coordinate with all of its thousands of trade partners across the country, to immediately cease all sales of these products that are already in stores. Logic will be required to reimburse its distributor and retailer customers for product that will likely be returned to Logic, and Logic's customers will immediately seek

out competitor products to fill the void, including possibly illegal or counterfeit product.

Absent an immediate administrative stay, Logic will lose the goodwill it has worked hard to obtain within the ENDS marketplace, as well as a substantial portion of its loyal customer base that it can never get back, even if its products are barred from sale only for a couple of weeks before receiving a full stay on the merits. *Id.* This unrecoverable loss of goodwill and client basis is plainly irreparable, meriting an administrative stay. *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998). Further, even if a stay is later granted after full briefing on the issue, many stores will continue to assume that Logic's products are unlawful and not worth the risk to restock, and customers might erroneously come to believe that Logic's products are unsafe for consumption compared to competitors. Ex.2 at 3–4.

Considerations of the public interest and any harms to FDA further support an administrative stay. FDA's conduct demonstrates that the public will suffer no harm if an administrative stay is granted: the agency has taken *over three years* to review Logic's application—nearly six-and-a-half times longer than the statutory 180-day review period, *see* 21

U.S.C. § 387j(c)(1)(A)—and at no point during those three-plus years did it seek to remove Logic's products from the market, *see, e.g.*, *id.*, and Logic actually received approved marketing orders for the tobacco versions of this same product in March of this year. Moreover, the public interest is in having governmental agencies follow the federal laws that govern their existence and operations. *See Ala. Ass'n of Realtors v. DHHS*, 141 S. Ct. 2485, 2490 (2021) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends."). An immediate administrative stay would further that interest by temporarily halting the effects of FDA's unlawful and unsupported decision, for the reasons discussed below. *Infra* pp.9–13.

b. Logic is likely to prevail on the merits for reasons not at issue in this Court's decision today in *Liquid Labs LLC v. U.S. Food & Drug Admin.*, No. 21-2883, 2022 U.S. App. LEXIS 29906 (3d Cir. Oct. 27, 2022).

The MDO is most obviously arbitrary and capricious because it fails to consider reasonably the record evidence that Logic conducted randomized controlled trials involving both tobacco and menthol variants, and those studies showed that adult smokers could use the subject products to facilitate smoking reduction at rates that are

comparatively favorable to the tobacco variants. *Contra Liquid Labs*, No. 21-2883, slip op. at 9 (noting the absence of evidence "demonstrat[ing] the benefit of [Liquid Labs'] flavored ENDS over an appropriate comparator tobacco-flavored ENDS").[7] Agency action is arbitrary and capricious, 5 U.S.C. § 706(2)(A), when it fails to "reasonably consider[ ] the relevant issues," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), by, among other things, "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–44 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Here, FDA failed to consider reasonably the overwhelming scientific evidence in Logic's PMTAs, including randomized controlled trials and 60-day studies looking at risk perceptions, intentions to use

---

[7] FDA's deficiency letter to Logic, which requested additional information to supplement the PMTAs, only asked Logic to provide additional information about the befits of non-tobacco and non-menthol flavored products relative to tobacco- and menthol-flavored products. FDA is now, for the first time, asking Logic to show the benefit of menthol-flavored products relative to tobacco-flavored products.

Logic products, the likelihood of switching from combustible cigarettes to Logic products, cigarette consumption reduction, flavor preferences, and other information, providing compelling evidence that Logic's menthol-flavored products have a higher likelihood of reducing cigarette consumption than their tobacco-flavored counterparts, have low-abuse liability, are most likely to be consumed by current smokers, and are unlikely to be used by nonusers. *See supra* p.3. By contrast, no record evidence indicates that youth are likely to use Logic's products in significant quantities and both past and current studies suggest the opposite. Thus, the "benefits" of Logic's products clearly outweigh their "risks," 21 U.S.C. § 387j(c)(4), and FDA does not reasonably explain how it considered these relevant issues or arrived at a contrary view, *Prometheus Radio Project*, 141 S. Ct. at 1158.[8]

Relatedly, FDA violated its own guidance on PMTA reviews in the MDO. In prior guidance, FDA explained that it would consider all

---

[8] FDA has not yet provided Logic the full scientific review report which details the reasoning behind its decision with specific references to Logic's PMTAs. All Logic has now regarding FDA's decision is the MDO's short summary, which is clearly inadequate, and a short administrative stay is warranted until Logic can review the full scientific report and move for a full stay.

evidence submitted, "weigh[ing] all of the potential benefits and risks from the information contained in the PMTA to make an overall determination of whether the product should be authorized for marketing." FDA, *Premarket Tobacco Product Applications for Electronic Nicotine Delivery Systems* at 12 (June 2019).[9] But FDA did not consider Logic's voluminous evidence, including important studies supporting the efficacy of its menthol products in getting adults to stop smoking cigarettes, without increasing the risk that youth would begin using its ENDS products, Ex.2 at 5, and FDA's failure to consider all this evidence contradicts that guidance. Moreover, FDA specifically stated in the MDO that it had "not reached final conclusions about the overall toxicological profile of the new products." Ex.1 at 2. Thus, FDA expressly admitted that it failed to "weigh[ ] all potential benefits and risks" and never "ma[d]e an overall determination of whether the product should be authorized for marketing," FDA, *Premarket Tobacco Product Applications*, *supra*; *contra Liquid Labs*, No. 21-2883, slip op. at 15–16 (affirming agency conduct where Liquid Labs submitted insufficient

---

[9] Available at https://www.fda.gov/media/127853/download.

evidence in support of its application). This too violates the APA, supporting Logic's likelihood of success.

Finally, the MDO also violates the APA in that it unjustifiably departs from FDA's common practices affording transition periods when ordering the withdrawal of marketed products, U.S. Const. amend IV, § 1; *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999); *accord N.J. Bd. of Pub. Utils. v. F.E.R.C.*, 744 F.3d 74, 104 (3d Cir. 2014) (stating that an agency must "suppl[y] a reasoned analysis . . . showing that prior policies and standards are being deliberately changed, not casually ignored")(alteration in original) (citation omitted), which was not at issue in *Liquid Labs*. Ordering the complete ban of a product is obviously deeply disruptive, *see supra* pp. 6–9, and so FDA typically does not issue complete product bans without first granting the manufacturer some transition period, *see, e.g.*, 73 Fed. Reg. 7565 (Feb. 2, 2008); 50 Fed. Reg. 27492 (July 3, 1985); 44 Fed. Reg. 45764, 45765 (Aug. 3, 1979). FDA has even afforded a "90-day transition period" before complete product bans even in extremely rare cases (unlike the case here) where a product poses "an imminent hazard to the public health," to avoid unreasonable business disruption to the manufacturer. *See* 44 Fed. Reg. at 45765.

Nevertheless, FDA's MDO affords Logic *no* transition period whatsoever before completely banning it from "introduc[ing] or deliver[ing] for introduction these products into interstate commerce in the United States," with no explanation at all for why it departed from its typical granting of a transition period.  Ex.1 at 1.

## CONCLUSION

This Court should grant this Emergency Motion For A Partial Administrative Stay.

Dated: October 27, 2022

Respectfully Submitted,

/s/ Misha Tseytlin

BRYAN M. HAYNES
TROUTMAN PEPPER
HAMILTON SANDERS LLP
1001 Haxall Point
15th Floor
Richmond, VA 23219
(804) 697-1420
bryan.haynes@troutman.com

KAITLIN L. O'DONNELL
TROUTMAN PEPPER
HAMILTON SANDER LLP
3000 Two Logan Square,
Eighteenth and Arch Streets
Philadelphia, PA 19103
(215) 981-4356
kaitlin.o'donnell@troutman.com

MISHA TSEYTLIN
*Counsel of Record*
Kevin M. LeRoy
SEAN T.H. DUTTON
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

*Attorneys for Petitioner*

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit. *See* 3d Cir. R. 28.3(d) & 46.1(e).

/s/ Misha Tseytlin
MISHA TSEYTLIN

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify this Motion complies with the requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in 14-point Century Schoolbook font, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 2,808 words, according to the count of Microsoft Word.

Dated: October 27, 2022

/s/ Misha Tseytlin
MISHA TSEYTLIN

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 27, 2022, I filed the foregoing with the Clerk of the U.S. Court of Appeals for the Third Circuit by causing a copy to be emailed to the Clerk's Office at: emergency_ motions@ca3.uscourts.gov, as the Clerk's Office instructed.

Pursuant to Federal Rules of Appellate Procedure 15(c) and 25(d), I certify that on October 27, 2022, a true and accurate copy of this Motion was served via electronic and first-class mail on the following:

> ROBERT M. CALIFF, *Commissioner*
> UNITED STATES FOOD AND DRUG ADMINISTRATION
> 10903 New Hampshire Avenue, HF-1
> Silver Spring, MD 20993-0002
> commissioner@fda.hhs.gov
>
> MARK RAZA, *Chief Counsel*
> ANN OXENHAM, *Assistant Deputy Chief Counsel for Litigation*
> OFFICE OF THE CHIEF COUNSEL
> UNITED STATES FOOD AND DRUG ADMINISTRATION
> 10903 New Hampshire Avenue
> White Oak Building 31
> Silver Spring, MD 20993-0002
> Mark.Raza@fda.hhs.gov
> Ann.Oxenham@fda.hhs.gov

MICHELE MITAL, *Acting Director*
MATTHEW R. HOLMAN, Ph.D. *Director, Office of Science*
CENTER FOR TOBACCO PRODUCTS
UNITED STATES FOOD AND DRUG ADMINISTRATION
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002
Michele.Mital@fda.hhs.gov
Matthew.Holman@fda.hhs.gov

DANIEL J. BARRY, *Acting General Counsel*
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Ave., S.W., Room 713-F
Washington, D.C. 20201-0004
Daniel.Barry@hhs.gov

XAVIER BECERRA, *Secretary*
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Ave., S.W.
Washington, D.C. 20201-0004
Xavier.Becerra@hhs.gov

LINDSEY POWELL
DEPARTMENT OF JUSTICE
CIVIL DIVISION, *Appellate Staff*
Room 7226
950 Pennsylvania Avenue N.W.
Washington, DC 20530
lindsey.e.powell@usdoj.gov

ALISA KLEIN
DEPARTMENT OF JUSTICE
CIVIL DIVISION, *Appellate Staff*
Room 7235
950 Pennsylvania Avenue N.W.
Washington, DC 20530
Alisa.klein@usdoj.gov

I declare the above to be true and correct under penalty of perjury.

Dated: October 27, 2022

/s/ Misha Tseytlin
MISHA TSEYTLIN

Exhibit 1



U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

October 26, 2022

**DENIAL**

Logic Technology Development LLC
Attention: Emil H. Weiss, Regulatory Affairs Manager
300 Frank West Burr Boulevard, Suite 70
Teaneck, NJ 07666

**FDA Submission Tracking Numbers (STNs):** Multiple STNs, see Appendix A

Dear Emil Weiss,

We completed substantive scientific review of your PMTAs[1] and are denying issuance of marketing granted orders for the tobacco products identified in Appendix A. Refer to Appendix B for a list of amendments received in support of your applications.

**The statute places the burden on the applicant to make the required showing by providing that FDA "shall deny an application" for a product to receive a PMTA marketing authorization if, "upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product," FDA finds that "there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health" (APPH). Section 910(c)(2)(A). Based on our review of your PMTAs, we determined that the applications for the new tobacco products, as described in your applications and specified in Appendix A, lack sufficient evidence to demonstrate that permitting the marketing of the products subject to these applications is APPH. You cannot introduce or deliver for introduction these products into interstate commerce in the United States. Doing so is a prohibited act under section 301(a) of the FD&C Act, the violation of which could result in enforcement action by FDA.**

You may submit new applications or resubmissions for the products that are subject to this marketing denial order. Resubmissions to address the deficiency set out below would be appropriate and facilitate an efficient review. Note that resubmissions are subject to all the requirements set forth in § 1114.17 of the "Premarket Tobacco Product Applications and Recordkeeping Requirements" rule. If you choose to submit resubmissions for these products, you should clearly identify the PMTA type as resubmissions and you must fulfill all requirements set forth in section 910(b) of the FD&C Act and 21 CFR Part 1114. To do so, you may cross-reference information submitted in:

- The new tobacco product applications, PM0000528.PD1, PM0000534.PD1 and PM0000539.PD1. subject to this Denial (see 21 CFR 1114.17)
- A Tobacco Product Master File submission (see 21 CFR 1114.7(b)(2) or 1114.17(c)(2); and guidelines at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/tobacco-product-master-files)

---

[1] Premarket Tobacco Product Applications (PMTAs) submitted under section 910 of the Federal Food, Drug, and Cosmetic Act (FD&C Act).

Whether new submissions or resubmissions, your PMTAs should include all information necessary to respond to the deficiency identified in this letter (see 21 CFR 1114.17(d)). Please note, however, that the deficiency identified in this letter is not necessarily the sole deficiency in your applications. We found that the deficiency identified below is dispositive of your applications because it precludes a finding that permitting the marketing of your new tobacco products is APPH. Accordingly, although FDA has reviewed your application from a toxicology perspective, FDA has not reached final conclusions about the overall toxicological profile of the new products.

We provide the following basis for our determination:

1.  Your PMTAs lack sufficient evidence demonstrating that the new products have a potential to benefit adult smokers in terms of complete switching or significant cigarette use reduction, that would outweigh the risk to youth.

    There is substantial evidence that the use of menthol flavors in tobacco products, like the menthol flavors in the new products, has significant appeal to youth and is associated with youth initiation of such products. The marketing restrictions and other mitigation measures that you proposed cannot mitigate these risks to youth sufficiently to reduce the magnitude of adult benefit required to demonstrate APPH. In light of the known risks to youth of marketing flavored ENDS (including menthol flavor), robust and reliable evidence is needed regarding the magnitude of the potential benefit to adult smokers. This evidence could have been provided using a randomized controlled trial, longitudinal cohort study, or other evidence demonstrating the benefit of the new products to adult smokers relative to tobacco-flavored ENDS products. Such evidence should include an appropriate comparator tobacco-flavored ENDS. Reliable and robust data are needed to evaluate the impact of the new products as compared to tobacco-flavored products on adult smokers' complete switching or significant reduction in cigarette use over time because tobacco-flavored products have not been shown to present the same risks to youth as tobacco products with other characterizing flavors. Whether other products give adult smokers comparable options for complete switching or significant cigarette reduction bears on the extent of the public health benefit that the new products arguably provide to that population. Finally, although this evidence is necessary to demonstrate that the subject ENDS provide benefits for adult smokers, it may not be sufficient to demonstrate that the marketing of the subject ENDS is appropriate for the protection of the public health: having established the benefit to adults, applications containing this evidence would still be evaluated to determine that the totality of the evidence supports a marketing authorization.

    Although your PMTAs include use behavior information from randomized clinical trial studies LP004 and LP005, those studies did not demonstrate that your menthol-flavored new products are more likely to promote complete switching or significant cigarette reduction compared to tobacco-flavored products. In addition, the published literature on the role of menthol-flavored ENDS and smoking cessation or reduction is limited and does not demonstrate that menthol-flavored ENDS are more effective in promoting complete switching or significant cigarette reduction relative to tobacco-flavored ENDS.

    Thus, based on your applicant-sponsored studies and the peer-reviewed studies in the literature, FDA is unable to determine whether or to what extent your menthol-flavored new products facilitate complete switching or significant cigarette reduction as compared to tobacco-flavored

ENDS products. Given the known risks to youth of marketing flavored ENDS, FDA would have needed this information to demonstrate that your menthol-flavored new products (PM0000528.PD1, PM0000534.PD1, and PM0000539.PD1) would provide a benefit to adult smokers sufficient to outweigh their risk to youth.

Because you have not met your burden of "showing" that permitting the marketing of the new products would be APPH as required by section 910(c)(2)(A), we must deny authorization for your application.

We encourage you to submit all regulatory correspondence electronically via the CTP Portal[2,3] using eSubmitter.[4] Alternatively, submissions may be mailed to:

> Food and Drug Administration
> Center for Tobacco Products
> Document Control Center (DCC)
> Building 71, Room G335
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

The CTP Portal and FDA's Electronic Submission Gateway (ESG) are generally available 24 hours a day, seven days a week; submissions are considered received by DCC on the day of successful upload. Submissions delivered to DCC by courier or physical mail will be considered timely if received during delivery hours on or before the due date[5]; if the due date falls on a weekend or holiday, the delivery must be received on or before the preceding business day. We are unable to accept regulatory submissions by e-mail.

If you have any questions, please contact Carlos Suarez, MPH, Regulatory Health Project Manager, at (301) 796 - 5453 or Carlos.Suarez@fda.hhs.gov.

Sincerely,

Todd L. Cecil - S

Digitally signed by Todd L. Cecil -S
Date: 2022.10.26 10:05:45 -04'00'

Todd Cecil, Ph.D.
Acting Director
Office of Science
Center for Tobacco Products

Enclosures:
Appendix A – New Tobacco Products Subject of This Letter
Appendix B – Amendments Received for These Applications

---

[2] For more information about CTP Portal, see https://www.fda.gov/tobacco-products/manufacturing/submit-documents-ctp-portal
[3] FDA's Electronic Submission Gateway (ESG) is still available as an alternative to the CTP Portal.
[4] For more information about eSubmitter, see https://www.fda.gov/industry/fda-esubmitter
[5] https://www.fda.gov/tobacco-products/about-center-tobacco-products-ctp/contact-ctp

Appendix A[6,7]
New Tobacco Products Subject of This Letter

| Common Attributes of PMTAs | |
| --- | --- |
| Submission date | August 19, 2019 |
| Receipt date | August 19, 2019 |
| Applicant | Logic Technology Development LLC |
| Product manufacturer | Logic Technology Development LLC |
| Product category | ENDS (VAPES) |
| **Attributes** | **New Tobacco Product** |
| STN | PM0000528.PD1[8] |
| Product name | Logic Vapeleaf Menthol Green Cartridge/Capsule Package |
| Product subcategory | ENDS Other |
| Package type | Blister Pack |
| Package quantity | 5 Capsules |
| Characterizing flavor | Menthol |
| Nicotine source | Tobacco |
| Additional properties | Mass of flavored tobacco granules per capsule: 310 mg, Nicotine Content: < 48.4 mg-dry base/g |
| STN | PM0000534.PD1 |
| Product name | Logic Pro Menthol e-Liquid Package |
| Product subcategory | Closed E-Liquid |
| Package type | Blister Pack |
| Package quantity | 2 Cartridges |
| Characterizing flavor | Menthol |
| Nicotine concentration | 20.0 mg/mL |
| E-liquid volume | 1.5 mL |
| PG/VG ratio | 70/25 |
| Nicotine source | Tobacco |
| STN | PM0000539.PD1 |
| Product name | Logic Power Menthol e-Liquid Package |
| Product subcategory | Closed E-Liquid |
| Package type | Blister Pack |
| Package quantity | 2 Cartridges |
| Characterizing flavor | Menthol |
| Nicotine concentration | 27.0 mg/mL |
| E-liquid volume | 1.2 mL |
| PG/VG ratio | 69/25 |
| Nicotine source | Tobacco |

[6] Brand/sub-brand or other commercial name used in commercial distribution.

[7] Effective April 14, 2022, FDA's authority to regulate tobacco products was extended to include tobacco products containing nicotine from any source. As such, nicotine source is considered a required property for unique identification. https://www.congress.gov/bill/117th-congress/house-bill/2471

[8] PD numbers were not used in previously issued letters.

**Appendix B**
Amendments Received for These Applications

| Submission Date | Receipt Date | Applications being amended | Reviewed | Brief Description |
|---|---|---|---|---|
| September 25, 2019 | September 25, 2019 | All | Yes | Response to FDA's September 18, 2019, information request |
| October 22, 2019 | October 22, 2019 | All | Yes | Response to FDA's October 15, 2019, information request |
| November 1, 2019 | November 1, 2019 | All | Yes | Response to FDA's October 24, 2019, information request |
| November 18, 2019 | November 18, 2019 | All | Yes | Final Site Inspection Agenda |
| December 20, 2019 | December 20, 2019 | All | Yes | Final Site Inspection Logistics |
| February 27, 2020 | February 27, 2020 | PM0000534.PD1 and PM0000539.PD1 | Yes | New product label information |
| July 9, 2020 | July 9, 2020 | All | Yes | Request for extension to June 26, 2020, Deficiency letter |
| December 17, 2020 | December 17, 2020 | All | Yes | Response to June 26, 2020, Deficiency letter |

# Exhibit 2

# In the United States Court of Appeals
## FOR THE THIRD CIRCUIT

———

LOGIC TECHNOLOGY DEVELOPMENT LLC
PETITIONER,
*v.*
U.S. FOOD AND DRUG ADMINISTRATION,
RESPONDENT.

———

## DECLARATION OF CORRADO MAUTONE

———

Corrado Mautone declares, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am the President of Logic Technology Development LLC ("Logic"), a position that I have held since January 2022

2.    I have been employed with the JT Group of Companies, of which Logic is a member, for well over 15 years.

3.    On August 19, 2019, Logic submitted Premarket Tobacco Product Applications ("PMTAs") to the U.S. Food and Drug Administration ("FDA"), seeking approval to market fifteen different products.  Logic was issued marketing granted orders on March 24, 2022, for its devices and for its tobacco flavored liquids.

4.    On October 26, 2022, FDA issued a Marketing Denial Order ("MDO") denying Logic's PMTAs for three menthol-flavored nicotine

vapor products: Vapeleaf Menthol Green Cartridge/Capsule Package, Pro

Menthol e-Liquid Package, and Power Menthol e-Liquid Package.  On the

same day, Logic requested an administrative stay of the MDO from the

FDA, pursuant to 21 C.F.R. § 10.35. FDA has not responded to this

request. In addition, Logic has not received the full scientific review

corresponding to the October 26, 2022 MDO, and has only a very brief

explanation of FDA's reasons for issuing the MDO.

5.    The Logic Pro Menthol and Logic Power Menthol e-Liquid

Packages are currently sold in close to 8,000 retail stores across the

country.  The products are produced in a contract manufacturing facility

abroad using a substantial work force. Logic has over $1.4 million worth

of materials and packaging in inventory dedicated to the manufacture of

Logic Pro Menthol and Logic Power Menthol e-Liquid Packages and the

electronic devices that they are used with.  Logic's menthol sales make

up over $6 million in annual revenue for the company, and many jobs in

the U.S. and abroad are reliant on these sales.

6.    Logic will suffer substantial irreparable harm complying with

the FDA's MDO—including in the immediate term—without an

administrative stay, as it affects two e-cigarette products that are

currently sold in the United States and have been sold in the United States since at least 2014.

7. *First*, the MDO immediately ends the enforcement discretion that FDA has provided Logic's products since August 8, 2016, when FDA deemed these products to be subject to its premarket review requirements. Pursuant to the MDO, Logic is required to immediately stop shipping the affected products, which will immediately impose significant compliance and logistical costs on the company. For example, Logic must immediately divert significant resources to ensure that the affected products are segregated from products that continue to be lawfully sold. Logic must also immediately divert personnel resources to ensure the affected products do not leave Logic's warehouses in China and that Logic's distributors are notified of the change. Logic may have to reimburse promptly its distributors and retailers for products in their inventory that they will return to Logic, imposing a significant additional cost on the company. Finally, Logic will lose the value of these affected products in its own inventory.

8. *Second*, without an administrative stay, Logic must immediately cease ordering the production of the products, which will

create significant costs for the company and its suppliers related to halting production schedules and setting aside materials that have been slated for manufacturing of these products.

9. *Third*, without an administrative stay, the mere publication of the MDO will *immediately* shift market share permanently against Logic, such that Logic will lose customers on an immediate and on-going basis. Distributors and retailers will immediately begin to seek replacement products to satisfy consumer demand. Once distributors and retailers find replacement products, it will become exponentially more difficult—if not impossible—for Logic to regain its customer base in the future. Even if FDA one day announced that these products could be lawfully sold, Logic will likely be unable to recoup its market share, as competitors will take Logic's place in the interim. Thus, the longer the cloud of legal uncertainty remains over these products, the longer Logic will be severely and permanently damaged. Logic has developed its distributor and retailer relationships over many years, and without them the company does not have a reliable avenue to market. If Logic is forced to take its products off the market, Logic will lose goodwill and trust with its trade partners.

10. *Fourth*, without an immediate administrative stay, Logic will immediately lose substantial goodwill in the market as consumers will perceive Logic's products to be harmful or unfit for use. Logic's products have been sold since at least 2014 without incident and Logic has gained a loyal customer base.

11. *Fifth*, Logic submitted its PMTAs well before the application deadline of September 9, 2020. Logic worked hard to meet FDA's requirements for PMTAs despite not having final regulations to guide the process. Logic is now being punished for moving swiftly to come into compliance with FDA's enforcement discretion policy early and is now the first applicant to receive a decision on menthol products based on a full scientific review. Our competitors, many of which waited until the very last minute to submit applications of varying quality, may continue to sell their products despite *also* not having yet received Marketing Granted Orders for these products, simply because they delayed submitting a PMTA as long as possible.

12. *Sixth*, Logic's PMTAs included extensive information showing that Logic's products, including menthol-flavored products, are not used by youth or nonusers. The literature review shows that Logic's products

are not listed as products of concern in any major national surveys on youth vaping. Logic has always employed responsible marketing practices in the United States and only targeted its marketing to adult tobacco consumers. These efforts are evident in our sales data, which shows that our consumer base is predominantly older tobacco users between 41 and 60, and only 7% consumers ages 21 to 30.

13.   *Seventh*, the MDO for the first time alerts Logic that FDA expected to see information comparing the benefit of menthol-flavored products relative to tobacco-flavored products. FDA's deficiency letter requesting additional information to supplement Logic's PMTAs requested information on the benefit of non-tobacco and non-menthol flavors relative to tobacco- and menthol-flavored products only. FDA has, throughout the PMTA process, been opaque about its stance on menthol-flavored products. Nonetheless, contrary to FDA's assertions, Logic did include information in its PMTAs to evidence the appeal of menthol-flavored products compared to tobacco flavored products, including results of randomized controlled trials and human clinical studies conducted over a span of sixty days. In exit interviews, adult smokers rated Logic's menthol-flavored products higher than tobacco-flavored

counterparts. Further, participants reported a higher intention to use for menthol-flavored products compared to other flavors, including tobacco.

FURTHER DECLARANT SAYETH NOT

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 27, 2022

Corrado Mautone